2020 IL App (2d) 180470-U
No. 2-18-0470
Order filed August 17, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16-CF-1133 |
| DONNIE DAVIS, | ) ) ) | Honorable Donald M. Tegeler Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The evidence was sufficient to convict defendant of armed robbery (armed with a firearm) and firearm-possession offenses even though no firearm was recovered, where the victim testified that the defendant displayed a firearm in the victim's home and robbed him of drugs and cash, and corroborating testimony was provided by the victim's girlfriend who was present in the home and by a jail inmate with whom defendant shared details of the robbery while jailed on unrelated charges.

¶ 2    Defendant, Donnie Davis, appeals from his convictions, following a bench trial, of armed robbery (720 ILCS 5/18-1, 18-2(a)(2) (West 2016)), unlawful possession of a firearm by a felon (*id.* § 24-1.1(a)), and unlawful possession of a firearm without a Firearm Owner's Identification Card (FOID card) in violation of section 2(a)(1) of the Firearm Owner's Identification Act (FOID

Act) (430 ILCS 65/2(a)(1) (West 2016)). He argues that the evidence was insufficient to prove beyond a reasonable doubt that he robbed the victim, because the State's witnesses were not credible. Alternatively, he argues that the evidence was insufficient to prove beyond a reasonable doubt that the object he used in the robbery was a "firearm," as defined by section 1.1 of the FOID Act (*id.* § 1.1), and he asks that we reduce his armed-robbery conviction to a robbery conviction (720 ILCS 5/18-1 (West 2016)), vacate the two firearm-possession convictions, and remand for resentencing. We affirm.

¶ 3                              I. BACKGROUND

¶ 4     The charges at issue stem from an incident that occurred on March 29, 2016. According to the victim, Danny Flores, defendant came to his house to buy drugs. Defendant followed Flores into the kitchen, where Flores retrieved the drugs from the freezer. Defendant pulled out a gun and robbed Flores of the drugs and $300. Defendant left and Flores called 911. Defendant was arrested on July 12, 2016, while in Kendall County jail on other charges.

¶ 5     The following testimony was presented at defendant's bench trial in June 2017. Flores, who was 26 years old, testified that, in March 2016, he lived in Aurora with his mother, along with his girlfriend, Destiny Esquivel, and their young son. He had been a member of the Insane Deuces street gang since he was about 14 or 15 years old, but, as of March 2016, he had been out of the gang for about a year. Flores and defendant used to be in the same gang, and he knew defendant by the nickname "Dirty." At about noon on March 29, 2016, defendant arrived at Flores's house, unexpectedly, to purchase "wax, a substance made from marijuana," from Flores. When defendant arrived, he knocked on the home's outer green door, which lead to an enclosed porch. Flores talked to defendant on the porch. After defendant showed him money, Flores entered the home through a white door, which lead from the porch to a living room, and walked through the living room to

the kitchen, with defendant following behind him. Esquivel was sitting on the living room floor with their son. Flores identified People's exhibit Nos. 1, 2, and 3 as pictures of the entrance to his house.

¶ 6 Flores testified that he retrieved the drugs from the freezer. He stated:

"[A]s I was retrieving the wax, I turned around to get it, I was looking inside the freezer. And then when I came back out with it, all I saw was a gun.

And the defendant took a couple steps towards me and put it to my chest and said, give me everything. And so he reached with his other hand and grabbed it from me and grabbed my wallet that was on the table.

And he proceeded to start walking towards the living room area really fast and out the door, the first door. And then he stopped at the second door because I was following him out, and he turn around and pointed the gun at me and said, '[Y]ou don't want to do this.' "

Flores testified that he saw the gun both in the kitchen and at the front door. When Flores was asked if he could describe the gun, the following colloquy took place:

"A. It was a black handgun, possibly a .380.

[DEFENSE COUNSEL]: Objection.

THE COURT: To the possibility?

[DEFENSE COUNSEL]: Possibility.

THE COURT: I'll sustain that.

BY [THE STATE]:

Q. Have you seen .380 weapons before?

A. Yes.

Q. So you know what they look like and are able to describe them?

A. Yes.

Q. Do you believe that's what it was that date?

A. Yes."

Flores testified that, when defendant turned and pointed the gun at him, both the green and white doors were open, and Esquivel was sitting on the floor in the living room. Defendant left and Flores closed the doors.

¶ 7     Flores testified that he called 911. When asked why he called 911, he testified: "Because I was scared. I didn't want this to happen to me again. And my son was home and I didn't want to leave myself open to this happening to me again." A recording of the call was admitted into evidence and played for the court. During the call, defendant told the operator that he was "robbed at gunpoint." He told the operator that the person who robbed him was named "Donnie Davis." When the operator asked, "What kind of gun did he have?" Flores responded, "Uh—I'm not sure. It happened so fast." When asked what the person took, Flores responded, "He took— he took money. I had my wallet in my pocket. He put the gun to my chest. And he told me to empty my pockets. I did. He took off with my cash and then he—he took off running. He took off running to New York Street." Flores described defendant and said that he took about $300.

¶ 8     Flores testified that, after he called 911, two squad cars arrived, and he spoke with Aurora police officer David Sheldon. He did not tell Sheldon that defendant had stolen drugs from him, because he "didn't want the investigation going into [his] house at the time because [he] was still selling drugs." Flores testified that, on April 5, he met with Aurora police officer Jason Cudebec at the Aurora police station and provided a taped statement. He told Cudebec "what really

happened at [his] house, that [he] was robbed for drugs and cash, not just the cash." Flores also told the officers that defendant may have believed that Flores owed him money.

¶ 9     Flores testified that he was contacted by Officer Hillgoth shortly after he had made the police report. Flores testified that he did not know, or ever talk to, anyone named Nathan Russell. Flores testified that, sometime in April, he ran into defendant, who was with a group of people, at a friend's house. When he saw defendant, Flores just walked away.

¶ 10     On cross-examination, Flores testified that he had been in a gang for "[a] while." At the time of the incident, Flores was a drug dealer. Flores stopped dealing drugs after his interview with the police. When the officers first arrived on the scene, Flores asked to speak to Officer Hillgoth, whom Flores knew because of his work as a confidential informant. When asked, "So is it fair to say the Aurora Police Department knows that you're a drug dealer?" defendant responded, "Yes." On March 29, 2016, he was selling drugs for himself. When the police arrived, there were still drugs in the house, but the police were not aware of that.

¶ 11     Flores conceded that, when he first spoke with Sheldon at the scene, he told him that, after defendant arrived, Flores went inside to retrieve his wallet. He told them that he stopped just inside the living room and took his wallet out of his front left pocket. He told them that, while they were in the area by the front door, defendant pulled a gun on him asked him to give defendant all of his money. When Flores subsequently met with Cudebec on April 5, he admitted to him that he was selling drugs, that he opened the door because he knew defendant, and that defendant had followed him through his house to the kitchen. He also told Cudebec that defendant had been to his house before, that he did not follow defendant out of the house, that there was another male in the house whom he refused to identify, and that he told Esquivel to lie when she met with the police.

¶ 12    On redirect examination, Flores testified that he told the 911 operator, Sheldon, and Cudebec that defendant had taken about $300, that defendant had put a gun to his chest, and that defendant ran toward New York Street. The only thing that he did not tell the 911 operator or Sheldon was that defendant had also stolen drugs.

¶ 13    Esquivel testified that she was 23-years old. On March 29, 2016, she lived with Flores and their young son at Flores's mom's house. At about 12:30 p.m., defendant, whom she knew as "Dirty," came to their house and knocked on the front door. Defendant talked with Flores and then they went to the kitchen. She could not see into the kitchen, but she heard Flores say, " '[D]ude, what the fuck.' " Next, she saw defendant "speed walking" out of the house with Flores "trailing him." She could see them at the green (outer) door. She testified: "Dirty opened up the front door leading outside and then [Flores] followed him. And then Dirty looked behind, turned right around and said, '[Y]ou don't want to do this,' and then that's when I saw the gun." She testified that the gun was pointed at Flores. She told Flores, "[S]hut the door, it's not worth it, we have our baby in here." Flores shut the door. When asked if she could describe the gun, she stated: "It was probably like a black gun, I was only able to see like five seconds of it." She testified that she saw "like a flash of it," "probably saw like enough of the barrel to know that it was like a black gun." After defendant left, Flores called the police. Before the police arrived, Flores told her "that all Dirty did was steal money." She did not learn that defendant had stolen drugs until after the police had left. Esquivel testified further that she was interviewed by the police in April. She told them that defendant had stolen "wax" and money. The police showed her a picture of defendant, and she identified him as the person who came to the house. Esquivel did not know anyone named Nathan Russell.

¶ 14 On cross-examination, Esquivel testified that Flores left the gang "[w]hen [she] got with him five years ago." Flores used to deal drugs but stopped on March 29, 2016. She did not know that there were drugs in the house on March 29. She talked to Flores before the police arrived at the house, and he told her to lie. She agreed that, when she was interviewed by Sheldon on the day of the incident, she told him that she heard Flores talking to someone and say, " '[L]et me grab my wallet,' " that she saw Flores grab his wallet and go outside, and that she saw Flores back up into the house with his hands up. She testified that what she told Sheldon was not true. She agreed that, when defendant got to the white (inner) door, she "saw the flash of the gun."

¶ 15 Esquivel testified further that, in response to a request from the police, she went to the Aurora police station on April 12 to give a statement. At that time, she did not know that Flores had previously given a statement on April 5. She told them that she lied on March 29 because she was afraid. She admitted that Flores told her not to tell them that defendant had gone in the house and not to tell them that defendant had stolen drugs. She told the officers that she "saw the gun in a flash, like [she] saw the gun real quick."

¶ 16 On redirect examination, she testified that she could not see into the kitchen from the living room, because there was a "curtain." When defendant exited the kitchen, she saw him carrying a "plastic baggie wrapped in like white paper." On April 12, she told the officers about the gun and the drugs. She also told them that, right before she saw the gun, she heard defendant say, " '[Y]ou don't want to do this.' " She told them that what she reported on March 29 was not true.

¶ 17 Sheldon testified that, when he arrived at Flores's house, he spoke with Flores and Esquivel. Flores was "upset." Esquivel was "upset and scared." He took their statements. Sheldon wrote in his report that Esquivel was "visibly shaken."

¶ 18    Nathan Russell testified that he was 41 years old and had been in the Kendall County jail for 27 months. Russell "knew of" defendant before meeting him in jail. Russell did not know Flores or Esquivel. While in jail, Russell was in the same "pod" as defendant; a pod holds ten inmates. Russell also worked in the laundry with defendant. According to Russell, defendant "liked to hear himself talk." Russell testified that, in June 2016, defendant was "talking to the whole pod" and told them what had happened with Flores. Defendant said that "some kid named Flores called the police on him, he couldn't believe he did it. What was he gonna say 'cuz he robbed him of drugs." Defendant said that he had "fronted [Flores] two ounces of weed months prior and that Flores refused to pay." Defendant's friends told him to "let it go, but he couldn't 'cuz they kept making fun of him." Defendant went to Flores's house "with the .380." When defendant went in the house, Flores's girlfriend was in the living room. Defendant followed Flores through the living room into the kitchen. Defendant took out money to show Flores. Flores told him "I only have a quarter ounce of weed but I have a bunch of dabs." Defendant acted out what he had done to Flores with the "pistol" by "pok[ing] [him] in the chest" with his finger. Defendant told Russell that he said " 'who do you think you're F-ing with.' " Russell testified:

"He said he took everything, the little bit of money he had on him and the dabs and the dope and walked out. Put the pistol in his waistband and walked out past the other two.

As he's walking through the room, Flores follows him out, is following him, saying, '[H]e just robbed me, he just robbed me,' I guess to the other two in there, his girlfriend and whoever else was in the living room.

And once he got past the front door, [defendant] got past the front door and on the porch, Flores followed him towards the door or maybe a little outside. And that's when [defendant] turned around and lifted up his shirt and says, what do you want to do; what

do you want to of [*sic*] make this or something, like, what's up. You want to make me do this, shoot you kind-of-thing. He didn't say that though, but he did say, what's up, like, what do you want to do."

Russell testified that defendant did not mention the exact amount of money that he took from Flores, but defendant told him that he left with $300, which may have included the money that defendant went there with.

¶ 19    Russell testified that he asked defendant whether the Aurora police came to the jail to talk to him about the robbery. Defendant told him that they did " 'but they ain't got no evidence, my word versus his.' " Russell testified that he had other conversations with defendant about the robbery. He stated: "Basically the same stuff over and over. It's like he was trying to convince me, like I was the jury or something. Like he's just practicing, like how's this guy's word better than mine?" Russell testified that he took notes about the conversation. After the conversations with defendant, he "went back over [his] notes and fine tuned a few things because [defendant] kept telling [him] the story over and over."

¶ 20    Russell testified further that, at one point, defendant "mentioned something about, if he was dead or if he was dead, like that, and he looks at me, he won't be able to show up. [Defendant] says, I'm need [*sic*] to make some phone calls." Russell was "a little worried about it" and he did not want "the kid" to get hurt. He knew defendant was getting out of jail in a week. Russell testified that he had told his lawyer about his concerns but that no one came to talk to him. When defendant brought up Flores a second time, Russell told him that he had a cousin who would be willing to "do [him] a favor." He told defendant that his cousin could "have this kid, you know, taken care of." Russell testified that he did not actually have a cousin; he just made it up. Later, while they were in the laundry room together, defendant told Russell that he was getting out soon. Defendant

wrote down his phone number on a piece of paper and handed it to Russell, telling Russell to have his cousin call that number. The piece of paper was an inventory list that Russell was compiling in the laundry room. Russell then contacted his girlfriend and asked her to contact the Aurora Police Department for him. Russell never heard any other inmates discuss this case.

¶ 21    Russell testified that, in October, he was contacted by Cudebec and Detective Edgar Gallardo, and met with them at the jail. Russell gave a recorded statement. Russell also gave them his notes and a copy of the phone number that defendant had written down. Russell identified People's exhibit No. 13 as the piece of paper containing the phone number that defendant had written down for him. Russell identified his handwritten inventory list on one side of the paper and the phone number that defendant had written down on the other side. Russell testified that, in exchange for his testimony, he was given three years off of the current offer in his case. He had also testified in a Cook County case but was not given any consideration.

¶ 22    On cross-examination, Russell agreed that, two weeks ago, he had testified in a Cook County case. When asked whether he was a "professional snitch," he replied, "No. A beginner." He stated that he did not know whether he was going to get any time off for his testimony in the Cook County case because it was the "first time." Russell testified that he had "never had a conversation with [Flores]" but he "might have seen him on the street." Counsel asked Russell if he knew what the Freedom of Information Act was. Russell responded: "My understanding of it. Freedom of Information Act, kind of self-explanatory, file something to get information." When asked, "[W]hat information do you get?" Russell responded, "I don't know. You'd have to tell me, you're the counselor." When asked, "So are you aware the Freedom of Information Act allows someone to get police reports?" Russell responded, "Okay." He testified that he "never filed a Freedom of Information thing."

¶ 23    Russell testified further that he wrote notes of his conversations with defendant. He did so while he was in front of defendant but after defendant began talking to other inmates. Defendant told everyone in the pod about the crime he had committed, not just Russell. Russell wrote two drafts of his notes and turned them over to the police. He stated: "When he kept talking, *** I added more to it." Defendant told Russell that he had not been charged in that case and that he was getting out of jail soon.

¶ 24    On redirect examination, Russell testified that he had never filed anything under the Freedom of Information Act and that he had never been given any discovery or police reports in jail.

¶ 25    Cudebec testified that he, along with Gallardo, interviewed Flores on April 5, 2016, at the police station. He interviewed Esquivel on April 12. Flores and Esquivel each provided a recorded statement. As part of his investigation, Cudebec checked if there were any surveillance cameras in the vicinity of the incident. There was a security camera at a car wash located nearby, but it was not working.

¶ 26    According to Cudebec, in late June, he was informed that an inmate at the Kendall County jail had information about the case. Cudebec met with Russell on July 7, 2016. He did not take a recorded statement at that time, but he took handwritten notes. He met with Russell a second time, in late October, and took a recorded statement. He did not promise Russell anything in exchange for the statement. He never showed Russell any police reports with respect to defendant or tell him about the offense. Russell showed him the dated notes that he had taken about defendant's comments. Defendant was arrested on July 12, 2016, at the Kendall County jail.

¶ 27    On cross-examination, Cudebec testified that, during his investigation, he never entered Flores's house. Cudebec testified that a gun was never located and that he never searched defendant's house.

¶ 28    The State rested. Defendant moved for a directed finding, and the motion was denied. Thereafter, the defense rested.

¶ 29    The trial court found defendant guilty of armed robbery (720 ILCS 5/18-2(a)(2) (West 2016)), unlawful possession of a firearm by a felon (*id.* § 24-1.1(a)), and unlawful possession of a firearm without a FOID card (430 ILCS 65/2(a)(1) (West 2016)). In so doing, the court noted that, considered in isolation, no prosecution witness's testimony would have amounted to proof beyond a reasonable doubt. However, the witnesses corroborated each other in several important respects. It noted that Flores's testimony was corroborated by Esquivel and that her corroboration "doesn't seem to be rehearsed." The court found that if it were rehearsed, then "she would have said something to the effect of she could have seen the events take place in the kitchen, she would have heard something else, she would have seen the gun as [defendant] walked by." The court also noted that Russell had no "connection" with anyone involved. Defendant told Russell "how the gun was supposedly pointed into Mr. Flores' chest. He has comments attributable to the defendant as to what type of gun which somewhat corroborate Mr. Flores. He has comments from the defendant as to why this may or may not have occurred." The court noted that "[t]hose statements have been uncontradicted." The court "found most interesting" the fact that Flores's testimony was corroborated by Russell's account of how defendant showed Russell, with a "finger knuckle to the chest," the way defendant pointed the gun into Flores's chest. The court also commented that it heard the 911 recording and had "no question *** that Mr. Flores was at least upset on the 911 tape, and it was done within minutes of this incident."

¶ 30    On September 14, 2017, the State petitioned to have defendant adjudged a habitual criminal. See 730 ILCS 5/5-4.5-95(a) (West 2016)). Following a hearing on February 15, 2018, the trial court granted the petition and sentenced defendant to life in prison on the armed robbery conviction. The court found that the firearm-possession convictions merged, and the court sentenced defendant to a five-year prison term concurrent with the life term. The court denied defendant's motion for reconsideration of his sentence, and defendant timely appealed.

¶ 31                                    II. ANALYSIS

¶ 32    Defendant first argues that the State failed to prove beyond a reasonable doubt that he robbed Flores, where the "evidence rested on the testimony of self-admitted liars Flores and Esquivel" and "self-professed 'beginner snitch' and convicted felon Russell."

¶ 33    In reviewing a challenge to the sufficiency of the evidence, "the question is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The trier of fact is responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts to ultimate facts. *McLaurin*, 2020 IL 124563, ¶ 22. The mere existence of conflicts in the evidence does not by itself require reversal, and the resolution of the conflicts in the evidence and the credibility of the witnesses is the province of the trier of fact. *People v. Ellzey*, 96 Ill. App. 2d 356, 358-59 (1968). The reviewing court must assume that the trier of fact resolved all controverted facts and issues of credibility in favor of the State. *People v. White*, 209 Ill App. 3d 844, 868 (1991). "In reviewing the evidence, this court will not retry the defendant, nor will we substitute our judgment for that of the trier of fact." *McLaurin*, 2020 IL 124563, ¶ 22. We will not set aside a criminal conviction unless the

evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). This standard applies whether the defendant received a bench trial or a jury trial. *People v. Howery*, 178 Ill. 2d 1, 38 (1997).

¶ 34    Here, a rational trier of fact could have found that the State proved beyond a reasonable doubt that defendant robbed Flores. Flores testified that defendant showed up at his house looking to buy drugs and showed him money. After speaking with defendant on the porch, Flores walked into the house, through the living room, and into the kitchen, followed by defendant. Flores testified that he removed drugs from the freezer and, when he turned around, he saw defendant with a gun. He testified that defendant put the gun to his chest and told Flores to give him everything. Defendant took the drugs and Flores's wallet. Defendant walked through the living room and onto the porch with Flores following behind. When defendant reached the outer door, he turned around and pointed the gun at Flores, saying "[Y]ou don't want to do this." Flores testified that defendant ran down New York Street. Flores immediately called 911 and reported that he had been robbed at gunpoint by defendant. The recording of Flores's 911 call revealed that he was upset.

¶ 35    Flores's testimony was corroborated by testimony from both Esquivel and Russell. Esquivel testified that defendant came to the house and walked through the living room to the kitchen with Flores. Although she could not see into the kitchen, she heard Flores say, " '[D]ude, what the fuck.' " She saw defendant "speed walking" out of the house with Flores "trailing him." She could see them at the green (outer) door. She testified: "Dirty opened up the front door leading outside and then [Flores] followed him. And then Dirty looked behind, turned right around and said, '[Y]ou don't want to do this,' and then that's when I saw the gun." She testified that the gun was pointed at Flores. When asked if she could describe the gun, she stated: "It was probably like

a black gun, I was only able to see like five seconds of it." She testified that she saw "like a flash of it," "probably saw like enough of the barrel to know that it was like a black gun." After defendant left, Flores called the police.

¶ 36    Russell's testimony further corroborated Flores's and Esquivel's accounts. Russell had no connection to Flores other than possibly having seen him "on the street." Both Flores and Esquivel testified that they did not know Russell. Russell testified that defendant bragged about robbing Flores with a .380 and taking his money and drugs. Russell testified that defendant demonstrated to him how he put the gun to Flores's chest by poking him with his finger. Russell's knowledge of the events would not have been possible but for defendant telling him about it. Russell provided officers with the paper from the laundry on which defendant had written his phone number.

¶ 37    Defendant argues that "a closer examination of the witnesses and their stories reveals numerous inconsistencies, improbabilities, and motives to lie that render their collective testimony unworthy of belief and insufficient to sustain the convictions." Defendant points to the fact that Flores and Esquivel initially lied to the police, that Flores had a motivation to testify favorably because he could have been charged with a drug offense, that Flores was unable to identify the gun on the 911 call, that Esquivel lacked credibility due to her relationship with Flores, that Esquivel's testimony was inconsistent with Flores's, and that Russell's testimony was incredible. We agree with the State that defendant is simply asking this court to reweigh the evidence, which is not our role. See *People v. McCullough*, 2015 IL App (2d) 121364, ¶ 74.

¶ 38    To be sure, when Flores and Esquivel initially talked to the officers who responded to the 911 call, neither of them said that defendant was there to buy drugs or that defendant had stolen drugs in addition to Flores's money. However, Flores explained that he did not tell the responding officers that defendant had entered the house and had also stolen drugs from him, because he

"didn't want the investigation going into [his] house at the time because [he] was still selling drugs." Although defendant argues that this explanation "does not pass muster" because Flores admitted that he was a confidential informant for Hillgoth and thus the police already knew he was a drug dealer, we do not agree. The fact that Flores was an informant does not mean that the police knew or sanctioned the fact that he was dealing drugs on his own behalf.

¶ 39    We are also not persuaded by defendant's argument that Flores had a "special motivation to testify favorably for the prosecution" to avoid being charged with a drug offense. Flores is the person who made the initial call to the police to report the offense. Given that he admitted to the officers during the investigation that defendant came to his house to buy drugs and that defendant had also stolen drugs from him, it is clear that he was willing to testify against defendant despite the possibility that he might also face charges. There is absolutely no indication that Flores testified against defendant only to avoid being charged himself.

¶ 40    We also disagree with defendant's argument that Flores's testimony that he " 'believed' " defendant's gun was a .380 was discredited by his "failure to identify the gun" when speaking to the 911 operator. At the outset of the 911 call, defendant stated that he was "robbed at gunpoint." As the court noted, Flores sounded "upset." (Indeed, the responding officer also noted that Flores was "upset" and that Esquivel was "visibly shaken.") The operator began asking questions about where Flores was located and what the person looked like. When the operator asked, "What kind of gun did he have," Flores responded, "Uh—I'm not sure. It happened so fast." As he continued talking, the operator asked, "What did he take?" Although Flores stated that he was "not sure" what kind of gun defendant had, the operator did not follow up with additional questions or give Flores time to think about it. In any event, there is no question that he made clear the fact that

defendant had a gun. It is certainly not out of the realm of possibility that, upon reflection and under calmer circumstances, Flores came to "believe" that the gun was likely a .380.

¶ 41    Defendant also argues that Esquivel's testimony lacked credibility due to her relationship with Flores and because her testimony was inconsistent. Defendant argues that Esquivel cannot be believed, because she testified that Flores left the gang "five years ago," whereas Flores stated it was closer to two years ago, and because she claimed that she did not know that there were drugs in the house, even though she lived in the "small house" with her son. Defendant also argues that it "strains credulity" that she would have spoken with police in April without first conferring with Flores. In addition, defendant contends that Esquivel's testimony on direct examination, that defendant had a gun at the green (outer) door, was contradicted by her testimony on cross-examination, that she saw the gun when defendant was by the white (inner) door.

¶ 42    As we have stated, the trier of fact is responsible for assessing the credibility of the witnesses, weighing the testimony, and drawing reasonable inferences from the evidence. *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001). Minor inconsistencies between witnesses' testimony or within one witness' testimony affect the weight of the evidence, but do not automatically create a reasonable doubt of guilt. *People v. Adams*, 109 Ill. 2d 102, 115 (1985). "A trier of fact is free to accept or reject 'as much or as little' of a witness's testimony as it likes." *People v. Rouse*, 2014 IL App (1st) 121462, ¶ 46 (quoting *People v. Logan*, 352 Ill. App. 3d 73, 81 (2004)). Here, the trial court heard Esquivel testify and specifically found that Esquivel's corroboration of Flores's testimony did not "seem to be rehearsed," stating that, if it were, then "she would have said something to the effect of she could have seen the events take place in the kitchen, she would have heard something else, she would have seen the gun as [defendant] walked by."

¶ 43    Defendant's attack on Russell's credibility similarly fails. Defendant argues that Russell's status as a convicted felon and jailhouse informant, together with the promise of a sentence reduction, seriously undermine his credibility. Defendant asserts that the "circumstances under which [Russell] claimed to have obtained information from [defendant] are wholly incredible." The trial court heard Russell's testimony. The court specifically rejected defense counsel's implication that Russell obtained his information about the crime from police reports. Although defendant also suggests that Russell more likely obtained the information from overhearing defendant talk about the State's evidence on the phone, the court obviously did not agree. The court found relevant and credible Russell's testimony that defendant demonstrated with his finger how he put the gun to Flores's chest. The court also relied on the fact the Russell had no connection to anyone in the case and that his account of the offense matched the account given by Flores and Esquivel. Although Russell testified on cross-examination that he "might have seen" Flores on the street, he made clear that he had never spoken to him.

¶ 44    Based on the foregoing, we cannot say that the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt

¶ 45    Defendant argues, in the alternative, that even if the State sufficiently proved that he robbed Flores, the State did not sufficiently prove that the object he used in the robbery was a "firearm" under Illinois law.

¶ 46    Under the armed robbery statute, the State was required to prove beyond a reasonable doubt that defendant knowingly took property by the use or threat of force while armed with a firearm. 720 ILCS 5/18-1, 18-2(a)(2) (West 2016)); *People v. Wright*, 2017 IL 119561, ¶ 71. For purposes of the statute, "firearm" is defined in section 1.1 of the FOID Act as "any device, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosion,

expansion of gas or escape of gas." 430 ILCS 65/1.1 (West 2016); *Wright*, 2017 IL 119561, ¶ 71. The FOID Act excludes the following from its definition of "firearm": "(1) any pneumatic gun, spring gun, paint ball gun or BB gun which either expels a single globular projectile *** or *** breakable paint balls"; "(2) any device used exclusively for signaling or safety"; "(3) any device used exclusively for the firing of *** industrial ammunition"; and "(4) an antique firearm (other than a machine-gun) which *** is primarily a collector's item and is not likely to be used as a weapon." *Id.*; *Wright*, 2017 IL 119561, ¶ 71.

¶ 47    Defendant contends that there was insufficient evidence to prove that the "object which witnesses described as a gun" was a firearm under the statute where it was based on the "equivocal statements" of three witnesses and where the gun was not introduced into evidence. In support, defendant relies, in part, on *People v. McLaurin*, 2018 IL App (1st) 170258, where the First District reversed an armed-habitual-criminal conviction, finding insufficient evidence of proof of a firearm. However, as noted by the State (and acknowledged by defendant in reply), that case was recently reversed by the supreme court. See *McLaurin*, 2020 IL 124563. Defendant argues that *McLaurin* is nevertheless instructive as it "illustrates the quality of evidence found sufficient to prove a firearm fitting the statutory definition, which is simply not present in this case."

¶ 48    In *McLaurin*, the supreme court considered whether the State presented sufficient evidence that the defendant possessed a firearm, as defined by the FOID Act, to sustain his conviction of being an armed habitual criminal (see 720 ILCS 5/24-1.7(a) (West 2014)). *McLaurin*, 2020 IL 124563, ¶¶ 21-38. At trial, a police officer testified that, while conducting surveillance in a parked undercover vehicle, she saw the defendant exit an apartment building " 'carrying a silver handgun' " and enter a van. *Id.* ¶ 4. She was approximately 50 feet away at the time and nothing obstructed her view. *Id.* The van drove away, and she immediately called for backup. *Id.* She

followed the van, and it was stopped by other officers. *Id.* The defendant and two other men exited the van. *Id.* ¶ 5. She did not see the defendant as he exited. *Id.* A gun was found at the scene of the stop. *Id.* Shortly thereafter, she was asked to identify the gun at the police station. *Id.* She identified the recovered gun as " 'the same color [and] size' " as the gun she saw in the defendant's hand. *Id.* She testified that, during her 12 years of experience as a police officer, she had worked with handguns and was familiar with them. *Id.* A second officer testified that a "9-millimeter chrome handgun" was recovered from underneath the van. *Id.* ¶ 8. The gun was not offered into evidence. *Id.* The defendant was found guilty of being an armed habitual criminal. *Id.* ¶ 14. The appellate court reversed the conviction, holding that the officer's testimony that she observed the defendant with an item that she believed to be a firearm, standing alone, was insufficient to sustain the conviction. *People v. McLaurin*, 2018 IL App (1st) 170258, ¶ 28. The court reasoned that, in the case of firearm-possession offenses, "the item possessed cannot be inferred from circumstantial evidence but must be proven beyond a reasonable doubt to be a firearm as defined by the statute." *Id.* ¶ 24. The State's petition for leave to appeal was granted.

¶ 49   In considering the issue, the supreme court reaffirmed its decisions in *People v. Washington*, 2012 IL 107993, and *People v. Wright*, 2017 IL 119561. At issue in *Washington* was whether the State presented sufficient evidence of a "dangerous weapon" to prove the defendant guilty of armed robbery, aggravated kidnapping, and aggravated vehicular hijacking. *Washington*, 2012 IL 107993, ¶ 29. (*Washington* interpreted a prior version of the armed robbery statute, which defined "armed robbery" as the commission of a robbery while armed with a " 'dangerous weapon,' " which was not statutorily defined. *Id.* at ¶ 6.) On appeal, the defendant argued that the evidence was insufficient, because no weapon was recovered and because no testimony was provided as to the size, weight, or metallic nature of the weapon. *Id.* ¶ 24. The appellate court

agreed but the supreme court reversed. *Id.* ¶¶ 25, 37. The court relied on the victim's testimony that the defendant pointed a gun at him, forced him into a truck, held the gun to his head, and then again pointed the gun at him while forcing him into the cargo area of the truck. *Id.* ¶ 35. The court noted that the victim had an unobstructed view of the weapon for several minutes and testified that it was a gun. *Id.* ¶ 35. The court rejected the argument that "it could not be known for sure whether the gun was real or a toy because no gun was ever recovered." *Id.* 36. The court concluded that given the victim's "unequivocal testimony and the circumstances under which he was able to view the gun, the jury could have reasonably inferred that defendant possessed a real gun." *Id.*

¶ 50     At issue in *Wright* was whether the evidence was sufficient to support a finding that the codefendant was armed with a "firearm," as defined in the FOID Act, during the commission of a robbery so as to support the defendant's armed robbery conviction. *Wright*, 2017 IL 119561, ¶¶ 69-77. At trial, the victim, who was working as the manager of a restaurant, testified that the codefendant told him " ' "[t]his is a robbery" ' " and lifted his hoodie to reveal what " 'looked like a black automatic, black gun.' " *Id.* ¶ 9. He testified that he thought it was a semiautomatic and that he had experience firing such guns. *Id.* He also testified that, as he was leading the defendant and the co-defendant to the restaurant office, he " 'felt something sharp in [his] back,' " which felt like the barrel of a gun. *Id.* ¶ 10. He was " '100% sure' " that the weapon displayed was an " 'actual firearm.' " *Id.* ¶ 29. A second witness testified that she saw the handle of a gun in the codefendant's waistband. *Id.* ¶ 12. A third witness testified that he had also seen the handle of codefendant's gun, that he had seen guns before, and that he believed that the gun was a " '9[-]millimeter pistol.' " *Id.* In finding that the evidence was sufficient to prove that the codefendant was armed with a firearm during the robbery, the court stated that its decision was controlled by the rationale expressed in

*Washington*, where it "relied on the testimony of a single witness and concluded that a rational trier of fact could infer from the testimony that the defendant possessed a 'real gun.' " *Id.* ¶ 76.

¶ 51    The *McLaurin* court, relying on both *Washington* and *Wright*, found that, although the evidence was "not overwhelming" and no gun was introduced into evidence, "a rational trier of fact could infer from the testimony presented in [the] case that defendant possessed a firearm as defined by the FOID Act." *McLaurin*, 2020 IL 124563, ¶ 35. The court emphasized that the officer testified that she was able to observe the defendant " 'carrying a silver handgun,' " that she was familiar with handguns, and that she identified the gun found by police as being the same size and color of the gun she saw in the defendant's hand. *Id.* ¶¶ 33-34. The court rejected the defendant's argument that the evidence was insufficient because it "simply consisted of [the officer's] testimony that she thought she saw a chrome item in defendant's hand that seemed to be a firearm" and because the officer "was unable to describe the item in any meaningful way and could not provide any detail, including whether it was a semiautomatic or revolver." *Id.* ¶ 35.

¶ 52    Here, we find that the evidence was such that a rational trier of fact could infer that defendant possessed a firearm. Like the officer in *McLaurin*, Flores testified unequivocally that defendant had a gun. Indeed, Flores observed the gun from a much closer distance than did the officer in *McLaurin*. Flores first saw the gun in the kitchen. He testified that, after retrieving the wax from the freezer, he turned back around toward defendant and "all [he] saw was a gun." He testified that "defendant took a couple steps towards [him] and put it to [his] chest." Flores saw the gun a second time at the front door. He testified that, while he was following defendant out of the house, defendant "turn[ed] around and pointed the gun at [him] and said, '[Y]ou don't want to do this.' " Like the officer in *McLaurin*, Flores testified that he had "seen .380 weapons before." He testified that he knew what they looked like and that he was able to describe them. Flores also

- 22 -

reported to the 911 operator that defendant had a gun and that he had put it to his chest. To be sure, when asked by the 911 operator "[w]hat kind of gun did he have," Flores responded, "I'm not sure." However, the trial court specifically noted that there was "no question" that Flores was "upset" during the call. Thus, the court could have reasonably concluded that, upon further reflection, Flores was able to opine that the gun was a .380. In addition, Esquivel testified that, from her position in the living room, she saw defendant point the gun at Flores. She testified that she saw the gun for "five seconds," that it was "a black gun," and that she saw "enough of the barrel to know that it was like a black gun." In addition to testimony from Flores and Esquivel, Russell testified that defendant told him that he went to Flores's house "with the .380." and that defendant acted out what he had done to Flores with the "pistol" by "pok[ing] [him] in the chest" with his finger. This lends support to Flores's testimony that he believed that the gun was a .380. Based on the above, a rational trier of fact could have inferred that defendant possessed a firearm.

¶ 53    Defendant's reliance on *People v. Ross*, 229 Ill. 2d 255 (2008), and *People v. Crowder*, 323 Ill. App. 3d 710 (2001), does not warrant a different conclusion. Defendant cites *Ross* for its emphasis that a finding that a gun is a dangerous weapon must focus on the "objective nature of the gun" rather than "the subjective feelings of the victim." *Id.* at 277. (Like *Washington*, *Ross* interpreted a prior version of the armed robbery statute, which defined "armed robbery" as the commission of a robbery while armed with a "dangerous weapon." *Id.* at 272 (citing 720 ILCS 5/18-1, 18-2(a) (West 2004)). In *Ross*, the victim testified that defendant demanded his wallet as he pointed " 'a black, very portable gun' " at him. *Id.* at 258. The victim described the gun as " 'small' " and " 'something you can conceal.' " *Id.* The gun used in the robbery was recovered (although not entered into evidence) and reported to be a BB gun with a 3-inch barrel. *Id.* In denying the defendant's posttrial motion arguing that the evidence was insufficient to prove that

the gun was a "dangerous weapon," the trial court stated that " 'the victim clearly believed it to be a dangerous weapon.' " *Id.* at 259. The *Ross* court, rejecting the trial court's reliance on the "subjective feelings of the victim," held that the evidence was insufficient to prove that the gun the defendant used during the robbery was a "dangerous weapon." *Id.* at 258. However, this was because any inference of dangerousness was precluded by the evidence at trial as to the nature of the gun used in the robbery. See *Washington*, 2012 IL 107993, ¶ 34 (discussing *Ross* and noting that "the evidence presented at trial showed that the 'gun' was, in fact, a small BB gun, with only a three-inch barrel"; thus, the evidence "actually precluded a finding that the 'gun' used by the defendant was a dangerous weapon"). Here, unlike in *Ross*, no BB gun or other toy gun was recovered that could have precluded the trial court from inferring that the gun used to commit the crime was not a toy gun.

¶ 54    Defendant cites *Crowder*, 323 Ill. App. 3d at 712, for the proposition that Illinois case law rejects the notion that a gun is simply what it " 'appears to be.' " In *Crowder*, the only issue on appeal was whether the trial court properly dismissed the indictment, which charged the defendant with unlawful possession of weapons by a felon and willful use of weapons, where the State destroyed the gun that formed the basis of the charges after the defendant requested to view it. *Id.* at 711-12. The court reasoned that without being able to inspect the weapon, the defendant would not be able to refute the State's contention that the weapon was a firearm. *Id.* at 712. Unlike *Crowder*, this case does not involve the destruction of a firearm sought by a defendant in discovery but instead involves the question of whether the evidence presented at trial was sufficient for a trier of fact to find beyond a reasonable doubt that defendant possessed a firearm during the robbery. For the reasons discussed above, we have found that the evidence was sufficient.

¶ 55                                III. CONCLUSION

¶ 56　　For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 57　　Affirmed.